DREY v. WATSON et al.

(Circuit Court of Appeals, Fourth Circuit.  May 24, 1905.)

No. 513.

1. RECEIVERS—SERVICES—ALLOWANCE.
    Where a receiver of property sold for $271,000 served for 29 months, during which he did not physically manage the property, which service was performed by other employés, and the principal service rendered by him was 125 days spent in various cities, for which he received $15 a day as expenses, and in the sale of the property, an allowance of $24,022.84, exclusive of such expense allowance, was excessive, and should be reduced to $15,000.

2. SAME—ASSIGNEE—COMMISSIONS.
    An allowance of 5 per cent. to an assignee of an insolvent on the money handled by him was reasonable.
    [Ed. Note.—For cases in point, see vol. 4, Cent. Dig. Assignments for Benefit of Creditors, § 1157.]

3. SAME—ALLOWANCES TO ATTORNEYS.
    On exceptions to a receiver's report, allowances made to attorneys for the receiver and the insolvent's assignee reviewed, and held excessive.

Appeal from the Circuit Court of the United States for the Northern District of West Virginia. .

B. M. Ambler and A. Leo Weil, for appellant.

F. B. Enslow and Daniel P. Hays (McCluer & McCluer and Melville D. Post, on the briefs), for appellees.

Before PRITCHARD, Circuit Judge, and BRAWLEY and WADDILL, District Judges.

PRITCHARD, Circuit Judge.  This is an appeal from the decree of the Circuit Court for the Northern District of West Virginia, in which certain allowances were made to the receiver, his attorneys, and to the assignee and his attorneys, as costs and expenses in the administration of the estate in the custody of the court.  Bettman, Watson & Bernheimer and Bettman & Watson were partnerships owning oil properties in the states of West Virginia, Ohio, Indiana, and Pennsylvania.  Assignments were made in the state of New York by the insolvents.  A bill was filed by one of the partners in the state of West Virginia, where the operating offices were located, asking the court to set aside the deeds of assignment, appoint a receiver, wind up the partnerships, and distribute the assets; and, as a result, John T. McGraw was appointed receiver.  Before his appointment he represented, as counsel, a large number of creditors, who, through him, opposed the appointment of a receiver.  Max Drey, appellant, owned claims against the firms of Bettman, Watson & Bernheimer and Bettman and Watson aggregating $223,236.-50, or 84.76 per cent. of the total indebtedness of the insolvents.  The master, to whom was referred the question as to the allowances which should be made to the receiver, his attorneys, and others in the administration of the estates, made a report, to which numerous exceptions were taken; and on the 5th day of February, 1903, the Circuit Court entered a decree confirming the same, and to which

decree counsel for appellant in their supplemental brief waived all exception to allowances so made, except as to the following, viz.:

#### Allowance to John T. McGraw, Receiver.

| | | |
|---|--:|--:|
| 5% on $308,703.43..................................... | $15,435 17 | |
| 2% on 271,300.00..................................... | 5,426 00 | |
| Expense account 125 days at $15 per day.............. | 1,875 00 | |
| Due from Bettman, Watson & Bernheimer and Bettman & Watson estates................................. | | $22,736 17 |
| 5% on $10,297.30 of Drey Bros. & Kahn interest........ $ | 514 86 | |
| 5% on 725.64 of David Leventritt interest.......... | 36 28 | |
| 5% on 1,021.33 of I. & S. Bernheimer interest........ | 51 06 | |
| Amount due from joint owners....................... | | 603 20 |
| On receipts for account of Jesse & Samuel Rosenthal.. $ | 279 17 | |
| On receipts for account of Jerome Rosenthal.......... | 2,279 40 | 2,558 57 |
| Total ......................................... | | $25,897 84 |

#### Allowance to J. G. McCluer, Attorney for E. W. Bloomingdale, Assignee.

| | | |
|---|--:|--:|
| To allowance March 5, 1898, to May 21, 1898.......... $ | 1,000 00 | |
| To allowance May 21, 1898, to July 19, 1898............ | 1,000 00 | |
| To expense account..... ........................... | 245 00 | $ 2,245 00 |

#### Allowance to J. G. McCluer, Attorney for John T. McGraw, Receiver.

| | | |
|---|--:|--:|
| To allowance ....................................... $ | 6,000 00 | |
| To expense account................................. | 377 50 | |
| To allowance ....................................... | 175 00 | 6,552 50 |
| | | $ 8,797 50 |

#### Allowance to E. W. Bloomingdale.

| | | |
|---|--:|--:|
| 5% on $22,262.27..................................... $ | 1,113 17 | |
| To allowance (conditioned as shown in report) from May 21, 1898, to July 19, 1898.................... | 860 81 | $ 1,973 98 |

#### Allowance to F. C. Reed, Attorney for E. W. Bloomingdale, Assignee.

| | | |
|---|--:|--:|
| To allowance ....................................... $ | 1,000 00 | |
| To expenses ....................................... | 518 93 | $ 1,518 93 |

#### Allowance to Hays, Greenbaum & Hershfield, Attorney for E. W. Bloomingdale, Assignee.

| | | |
|---|--:|--:|
| To allowance from March 8, 1898, to May 21, 1898...... $ | 1,500 00 | |
| To allowance from May 21, 1898, to July 19, 1898...... | 2,500 00 | |
| To allowance for services after July 19, 1898........... | 500 00 | $ 4,500 00 |

#### Allowance to F. B. Enslow, Attorney for E. W. Bloomingdale, Assignee.

| | | |
|---|--:|--:|
| To allowance from June, 1898, to July 19, 1898........ | | $ 1,000 00 |

#### Allowance to F. B. Enslow, Attorney for John T. McGraw, Receiver.

| | | |
|---|--:|--:|
| To allowance ....................................... $ | 4,500 00 | |
| Expense account ................................... | 765 75 | $ 5,265 75 |
| Allowance ......................................... | | 495 00 |
| | | $ 6,760 75 |

The report of master shows that the receiver made frequent trips. to New York looking to the adjustment of the affairs of the property in his custody, with a view of bringing about a compromise among creditors, and endeavoring to form a syndicate of them for the purpose of disposing of the property at an advantageous price to the creditors. It appears that he did not succeed in any of these attempts. He also attended before the master in New York, and visited that state several times for the purpose of investigating the books and accounts of the firms of Bettman, Watson & Bernheimer and Bettman & Watson, relative to Stettheimer & Bettman. He employed M. A. Bettman at a salary of $75 per week from the date of his appointment as receiver until a sale of the property on January 28, 1901, for the purpose of looking after the Indiana property. He kept the general office of the two estates at Parkersburg, W. Va., and retained Gilbert L. Watson, as superintendent, for which services he paid him the sum of $125 per week from the date of his appointment until the sale of the property. M. A. Bettman received from the receiver for services above indicated the sum of $9,900, and the receiver paid Gilbert L. Watson for services. rendered as superintendent the sum of $16,500. Watson had control and management of all the property of these estates, including the property over which M. A. Bettman had control, before the appointment of the receiver, and before the firm made an assignment. The report of the master also shows that Watson could have managed the whole property, and that Bettman was an unnecessary employé. It appears that the receiver was away from home 125 days, looking after the affairs of the two estates; that he was allowed the sum of $15 per day, while thus engaged, as expenses, amounting in the aggregate to $1,875; that he visited New York, Baltimore, Parkersburg, and Clarksburg; there were almost daily transactions in his office at Grafton concerning the properties, but he did not give anything like all his time to the business of the receivership; that Watson had control and management of all the physical operations of the property; that on one occasion the receiver met some parties in Clarksburg, and compromised a lease for $3,000, which would have been lost to the estate, and which was a valuable asset. It also appears that he conferred with Watson from time to time as to the operations of these two estates, and that he sold the property at public auction at the door of the federal court house in Parkersburg, on the 28th day of January, 1901, to Max Drey, for the sum of $271,000; that out of that sum only $48,-063.50 came into his hands as receiver. The balance of the funds arising from the sale of the properties was permitted to remain in the hands of the purchaser, because he represented and owned nearly all of the debts against the estates. The receiver claimed to have sent telegrams, for which there are no vouchers or itemized account for $293, which was allowed; that he claimed postage at Grafton $250, for which there are no vouchers or itemized account; that he claims $2,500 as expenses incurred by him in the discharge of his duties as receiver, on account of which he was allowed. It appears that the receiver was allowed the sum of $1,375 as a premium for

giving an indemnity bond which he executed for the faithful performance of his duties. The receiver borrowed $30,000 from a bank, in which he was a director, for a period of 90 days, and paid therefor as interest the sum of $1,730, which was allowed. The evidence shows that he had the use of about $15,000 from that bank for less than 60 days, and that by the end of September, 1898, he not only had all the money refunded, but there was a balance to his credit for the remainder of the time for which the trust received no interest. This amount was under the absolute control of the receiver.

In view of the facts, it is difficult to understand the basis upon which the different allowances were made to the receiver. He served as receiver for 29 months, but the evidence shows that during that period he was not burdened with the physical management of the property, the principal service which he rendered being 125 days spent in New York and other cities, for which he received $15 per day as expenses. It does not appear that he was in attendance at any of the courts wherein matters pertaining to the estates were involved, but, on the other hand, the master's report shows that he relied mainly on his superintendent for the information which he obtained as to the management and control of the property intrusted to his care. It appears that he only visited one of the properties in West Virginia on one occasion. It further appears that the superintendent actually drew most of the checks, and practically did all of the work that is ordinarily required of a receiver. That he received, as such receiver, the sum of $24,022.84, exclusive of $15 per day for 125 days, which was allowed him as expenses.

We are of opinion that the amounts allowed the receiver are disproportionate to the amounts involved in the administration of the estates intrusted to his care and custody. Where property is placed in the hands of a receiver, its administration should be conducted in the same way, and the same rules of prudence and economy should be observed by the receiver that obtain in the management and control of the private interests of individuals. To adopt any other rule would bring the courts in disrepute, and would be a manifest abuse of the power thus conferred. In Foster's Federal Practice, § 258, it is said:

"In cases of moderate amount, a commission of five per cent. on receipts and disbursements is not unusual. Where the amounts received and disbursed are large, it is customary to pay the receiver a salary or a lump sum graduated according to the amount of his time employed, the value of the property, the difficulty of his task, and the success of his administration."

While we are reluctant to interfere with the decree of the Circuit Court where the facts have been found by the master and approved by the court, at the same time we are of opinion that the amounts allowed to the receiver in this case are excessive, and should be reduced to a sum commensurate with the services actually rendered by him in the administration of the estates that were placed in his custody. In view of the evidence, we think that the sum of $15,-000 as compensation to the receiver, in addition to the allowance

made for expenses, would be amply sufficient to remunerate him for services rendered.

We next come to the consideration of the item of allowance of $1,973.98 to E. W. Bloomingdale, assignee. This amount, we believe under the circumstances, should not be disturbed; the larger portion of it being made up of the commission of 5 per cent. upon the money handled by him, which seems reasonable.

The next exception presents for our consideration the allowance made to J. G. McCluer, attorney for E. W. Bloomingdale, assignee, and also as attorney for John T. McGraw, receiver. On the first account he was allowed $2,245, and on the latter $6,552.50, certain items of expense being included in each account; the actual allowance to him as counsel fees being $8,000. The first service by this attorney was in representing the assignee from the 5th of March, 1898, to May 1, 1898, $1,000. We are inclined to allow this item. But the next fee, of $1,000 for services rendered the assignee pending the contest over the receivership, we think was excessive, and that $500 would be full compensation therefor. Considering the item of $6,000 made to this same counsel for services rendered the receiver, we think that in the light of the facts, as reported by the master, as to the services rendered, this charge is likewise excessive, and that on that account, and in view of the fact of the employment of other counsel by the receiver for the performance of substantially the same service, the sum of $4,000 is ample compensation.

We next consider the exception to the allowance made F. B. Enslow, attorney for the assignee and receiver, $1,000 of which was for services to the assignee in resisting the receivership, and $4,995 for services to the receiver, in addition to the expense account of $767.65. We think that the $1,000 item in favor of Enslow should be reduced to $500 for the reasons stated in passing upon a similar claim of J. G. McCluer, and that $4,995 for services rendered the receiver, for the reasons also stated in passing upon a similar claim of J. G. McCluer, is excessive, and should be reduced to $3,500.

We now consider the exceptions to the allowance made Hays, Greenbaum & Hershfield, attorneys for E. W. Bloomingdale, assignee, amounting to $4,500. This charge is made up of three items —one of $1,500, between the dates of March 8, 1898, and May 21, 1898, for services rendered Bloomingdale, assignee, in connection with this trust, and $2,500 for services from May 21, 1898, to July, 1898, and $500 additional for services after the receiver was appointed. The item of $2,500 paid to these attorneys for resisting the appointment of the receiver is excessive. The first item of $1,500 was abundantly ample for the services rendered, and, taking into consideration this fact, and also the additional allowance of $500 for services rendered the assignee, we think the item of $2,500 should be reduced to $1,000.

We now finally consider the exception to the claim of F. C. Reed, attorney for E. W. Bloomingdale, assignee, of $1,000, and $518.93 expenses. We think, in the light of the services claimed to have been rendered by this attorney, and the findings of the master there-

on, and the large item of expenses allowed against the trust estate in his behalf, that $1,000 is excessive, and that the sum of $500 is a reasonable and proper fee for the services rendered, and the allowance made will be reduced to this amount.

What we have heretofore said in passing upon the receiver's compensation in regard to the prudence and economy which should be observed in the administration of estates in the custody of the court applies with equal force in considering the allowances to counsel. Not only were the amounts awarded counsel under the facts and circumstances of this case, in our judgment, much too high, but the number of counsel employed in connection with the litigation, and who claimed compensation for services rendered the trust estate, were out of proportion to the work performed.

The decree of the Circuit Court is reversed. Let the cause be remanded, with instructions that the decree be modified in accordance with the views herein expressed.

Reversed